UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| NELSON YOUNG ) | |
|    Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 19-1196 |
| ) | |
| WEXFORD HEALTH SOURCES and ) | |
| MICHAEL S. RUSSELL, ) | |
|    Defendants ) | |

CASE MANAGEMENT AND SUMMARY JUDGMENT ORDER

JAMES E. SHADID, U.S. District Judge:

This cause is before the Court for consideration of Defendant Dr. Michael Russell's Motion for Summary Judgment, [85]; Defendant Wexford's Motion for Summary Judgment, [96]; Defendant Russell's Motion to Strike Plaintiff's Affidavit, [98]; and Defendant Russell's Motion for Sanctions. [99]. For the following reasons, Defendant Russell's Motion to Strike and Motion for Sanctions are DENIED. [98, 99]. Defendant Russell and Defendant Wexford's Motions for Summary Judgment are GRANTED. [85, 96].

I. BACKGROUND

The *pro se* Plaintiff alleges Defendants Wexford and Dr. Russell violated his Eighth Amendment rights when they were deliberately indifferent to his serious medical condition.[1] *See* September 19, 2019 Merit Review Order. Specifically, Plaintiff

---

[1] Plaintiff voluntarily dismissed Defendants Illinois Department of Corrections Medical Director Steven Meeks and Dr. Peter Kehoe. *See* April 13, 2022 Text Order.

alleged he had cataracts in both eyes which grew worse over a period of years. Plaintiff says the Defendants knew he needed cataract surgery, but they refused to approve it.

The June 12, 2019 complaint stated: "[p]resently I cannot see anything out of my left eye. My vision in my left eye is a complete blur. My right eye is only slightly better. I cannot read anything unless it is held an inch or so from my face." (Comp. p. 5.). Plaintiff claims the Defendants refuse to approve the needed surgery due to Wexford's widespread practice or policy of delaying cataract surgery until an inmate goes "completely blind." (Comp. p. 5.)

II. MOTION TO STRIKE AND MOTION FOR SANCTIONS

Before considering the pending Motions for Summary Judgment, the Court must first consider Defendant Dr. Russell's Motion to Strike Plaintiff's affidavit filed in support of his summary judgment response and the Defendant's Motion for Sanctions based on the same affidavit. [98, 99].

Defendant Russell argues Plaintiff has submitted a "sham affidavit." (Def. Mot., [98], p. 2). In the Seventh Circuit, "the sham-affidavit rule prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony." *James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020), *citing Dunn v. Menard, Inc.*, 880 F.3d 899, 910 (7th Cir. 2018). However, "the sham-affidavit rule is narrow and should be applied with caution." *James*, 959 F.3d at 317, *citing Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 571 (7th Cir. 2015)(cautioning that the sham-affidavit rule "must be applied with great care ... because summary judgment is not a tool for deciding questions of credibility").

The Seventh Circuit has recognized three exceptions to the rule. *See James,* 959 F.3d at 317. The sham-affidavit rule does not apply when the affidavit "contradicts prior testimony but contains newly discovered evidence." *Id.* A judge may also consider an affidavit if appears a deponent "was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy. "*Russell v. Acme-Evans Co.,* 51 F.3d 64, 68 (7th Cir. 1995). Finally, a supplemental affidavit may be allowed if it "clarifies ambiguous or confusing deposition testimony." *Id.*

Defendants first argue Plaintiff repeatedly states he told Defendant Dr. Russell "about pain in my eye and the constant migraine headaches." (Def. Mot., [98], Ex. A, Plain. Aff., para. 4; para. 6, 7). However, in his deposition, Plaintiff testified the only pain he experienced was when he would "bump into things…But as far as my eye, no, my eye did not ache." (Def. Mot., [98], Ex. B, Plain. Depo, p. 42). In addition, Plaintiff did not state he had any pain in his right eye and did not mention migraines when asked directly about pain or his complaints. (Def. Mot., [98], Ex. B, Plain. Depo, p. 42, 68). The Plaintiff's affidavit clearly contradicts his previous deposition testimony and therefore cannot be considered at summary judgment. *See Janky v. Lake County Convention & Visitors Bureau,* 576 F.3d 356, 362 (7th Cir.2009); *Ineichen v. Ameritech,* 410 F.3d 956, 963 (7th Cir.2005); *Essick v. Yellow Freight Systems, Inc.,* 965 F.2d 334, 335 (7th Cir.1992).

Plaintiff's affidavit also claims Defendant Dr. Russell never examined Plaintiff with his glasses off. (Def. Mot., [98], Ex. A, Plain. Aff., para. 3, 6). The Defendant argues Plaintiff admitted in his deposition that the Defendant performed a routine eye examination on May 27, 2016. (Def. Mot., [98], Ex. B, Plain. Depo, p. 67). Defendant Dr. Russell's medical notes indicate Plaintiff's "uncorrected" vision in each eye, which Defendant states could only be recorded without Plaintiff's glasses. (Def. Mot., [85], IDOC #108).

Plaintiff also admitted the Defendant tested him for glaucoma. Def. Mot., [98], Ex. B, Plain. Depo, p. 70). Defendant Dr. Russell says his medical notes demonstrate he used a non-contact tonometry (NCT) to measure the pressure in Plaintiff's eyes, and this instrument "works by emitting a steadily increasing puff of air on the cornea to depress it, which allows the machine to calculate intraocular pressure." (Def. Mot., [98], p. 3-4); (Def. Mot., [85], IDOC #108). The Defendant was able to obtain readings from each eye which he could not do if Plaintiff was wearing his glasses.

The Defendant has not pointed to any statement in Plaintiff's deposition in which he discusses this issue. Therefore, Defendant has not pointed to a contradiction in Plaintiff's prior testimony, but instead noted an issue of credibility.

Plaintiff's affidavit next claims Defendant Dr. Russell "performed the Humphry Visual field test on me" on June 16, 2016, and during the test, Plaintiff "could not see anything out of my left eye, it was a complete blur." (Def. Mot., [98], Ex. A, Plain. Aff., para. 6). The Defendant argues Plaintiff previously testified he could not remember if any kind of visual field testing was performed.

4

In the portion of the deposition cited, Plaintiff states Defendant Dr. Russell tested his vision, but he could not remember testing done "at any outside facility." (Def. Mot., [98], p. 4, *citin*g Ex. B, Plain. Depo. p. 66).   This portion of the deposition testimony does not specifically refer to the Humphry Visual Field Test, nor do the parties offer any explanation of the test, or if it was done an outside facility. There is too much ambiguity in the record to find the Plaintiff's affidavit contradicts his prior testimony.

Plaintiff's affidavit states on September 1, 2016, the vision in his right eye was not 20/20 and his left eye was not 20/50 as noted in the medical record. (Def. Mot., [98], Ex. A, Plain. Aff., para. 7).  During his deposition, Plaintiff was asked if he knew his visual acuity during the second visit with the Defendant, and Plaintiff stated that he did not. (Def. Mot., [98]. Ex. B, Plain. Depo., p. 69).

In his response to the motion to strike his affidavit, Plaintiff now says he did not know what "visual acuity meant," even though he did not ask for clarification during the deposition. (Plain. Resp., [104], p. 5).  In addition, Plaintiff says he advised the Defendant he had blurry vision in his left eye and could only see about three feet in his right eye without glasses.  Nonetheless, Plaintiff is not qualified to provide a specific assessment of his visual acuity particularly while wearing glasses, nor has he provided any basis to dispute the findings. The Court will not consider Plaintiff's affidavit as it pertains to the results of this test.

Plaintiff's affidavit claims in he "did not return to Pontiac's Optometry Clinic until August 30, 2018, because Dr. Russell and Wexford refuse to provide me with any further eye treatment despite my numerous complaints to them about continuing

5

deterioration of my vison and eye pain." (Def. Mot., [98], Ex. A, Plain. Aff., para. 10). However, Defendant argues Plaintiff testified in his deposition he did not know why there was a two-year gap between his last appointment and his return to the optometry clinic. (Def. Mot., [98]. Ex. B, Plain. Depo., p. 73).

The complete testimony includes Plaintiff's statement that he did not think there was an eye doctor at the facility during this time, but he "kept puttin' in." (Def. Mot., [98]. Ex. B, Plain. Depo., p. 73). Plaintiff explains he meant he kept putting in eye exam requests, but he did not receive a response. Defendants have not demonstrated a contradiction in statements.

Because most of Plaintiff's affidavit is not strictly contradictory to his prior deposition testimony, the Court will not strike the affidavit in its entirety and the Defendant's motion is denied. [98]. Consequently, the Motion for Sanctions is also denied.[99].

Nonetheless, the Court will not consider Plaintiff's claim that he reported eye pain and migraines to Defendant Dr. Russell since it directly contradicts his deposition testimony, nor Plaintiff's unsupported claim regarding the results of a visual acuity test.

### III. MOTION FOR SUMMARY JUDGMENT

A. FACTS

Plaintiff was incarcerated at Pontiac Correctional Center from January 1, 2016, to the filing of Plaintiff's complaint on June 12, 2019. (Def. Mot., [85], UMF 5, 6); [1]. Plaintiff has no medical training. (Def. Mot., [96], Plain. Depo., p. 18).

6

Prior to his incarceration, Plaintiff suffered a serious injury to his left eye when he was hit with a stick and required hospitalization. (Def. Mot., [85], Plain. Depo., p. 61. The accident caused significant retinal damage, a cataract, and "structural damage." (Def. Mot., [85], Jay Aff., para. 2, 6).

Defendant Dr. Russell is an optometrist who was hired by Wexford Heath Sources as an independent contractor to work one, eight-hour day each week at Pontiac. (Def. Mot., [85], Ex. C, Russ. Aff., para. 5, 6). Wexford Health Services had a Cataract Management Policy which laid out the criteria for approving cataract surgery for Illinois Department of Corrections (IDOC) inmates. (Def. Mot., [85], Ex. C, Russ. Aff., para. 7).

The Defendants have provided a copy of the specific Wexford's ophthalmological guidelines which includes a preface advising advises medical staff the guidelines are not meant to "replace sound clinical judgment, nor are they intended to strictly apply to all patients." (Def. Mot., [96], Ex. C, p. 1). Instead, "their application is a decision made by the practitioner accounting for individual circumstances." (Def. Mot., [96], Ex. C, p. 1).

Wexford's Utilization Management Medical Director Stephen Ritz claims the guidelines are "based on best medical practices and prevailing industry standards, as it concerns health care provided in correctional settings" and are based in part of the Federal Bureau of Prison standards. (Def. Mot., [96], Ritz Aff., para. 6).

Pursuant to the guidelines, cataract extraction is indicated in a variety of circumstances including "subjective symptomology, objective reproducible clinical

7

findings, and the presence of co-existing conditions (like diabetes or glaucoma)." (Def. Mot., [96], Ex. F, Ritz Aff., para. 11: Ex. C, p. 3). The policy states surgery is not indicated if "corrected bilateral Snellen visual acuity is 20/50 or better." (Def. Mot., [85], Ex. C, Russ. Aff., para. 8).

Wexford Medical Director Ritz says decisions are to be made on case-by-case basis, with the guidelines offering assistance to onsite physicians and optometrists. (Def. Mot., [96], Ex. F, Ritz Aff., para. 17).

Defendant Optometrist Dr. Russell says he does not have the training or medical license to perform cataract surgery himself, nor could he approve surgery. (Def. Mot., [85], Ex. C, Russ. Aff., para. 4, 10). However, Plaintiff notes the Defendant still had the ability to send a request for cataract surgery to Wexford for its consideration.

During his first eye examination at Pontiac, Optometrist Dr. Peter Kehoe diagnosed Plaintiff with a traumatic left eye cataract, but the doctor did not recommend cataract extraction surgery. (Def. Mot., [96], UMF #6, Ex.A, Bates #236). Plaintiff notes he did not meet Wexford's guidelines for cataract surgery. (Plain. Resp., [103], p. 2).

Defendant Dr. Russell met with Plaintiff on two occasions at Pontiac. (Def. Mot., [85], Ex. C, Russ. Aff., para. 11, 19). During the first visit on May 27, 2016, Plaintiff advised Defendant he had suffered a left eye trauma in 2005. (Def. Mot., [85], Ex. C, Russ. Aff., para. 12). The optometrist's examination noted Plaintiff had 20/20 vision in his right eye and 20/50 vision in his left eye while wearing his glasses. (Def. Mot., [85], Ex. C, Russ. Aff., para. 13). Plaintiff maintains when he was not wearing his glasses, he

8

had only blurry vision in his left eye, and he could only see about three feet with his right eye. (Plain. Resp., [93], p. 3).

Defendant Dr. Russell diagnosed Plaintiff with a traumatic cataract in his left eye and stable vision. (Def. Mot., [85], Ex. C, Russ. Aff., para. 14, 15). The Defendant advised Plaintiff he was not a candidate for cataract surgery pursuant to Wexford's Cataract Management Policy. (Def. Mot., [85], Ex. C, Russ. Aff., para. 16). The Defendant also found Plaintiff was a "glaucoma suspect" and referred Plaintiff for a Humphrey Visual Field Test "which evaluates peripheral vision." (Def. Mot., [85], Ex. C, Russ. Aff., para. 17; Ex. E., Jay Aff., para. 7).

Wexford approved the examination which was done on June 21, 2016. (Def. Mot., [85], Ex. C, Russ. Aff., para. 18; Ex. E, Jay Aff., para. 7, IDOC # 109-110, 116-117). Defendant Dr. Russell reviewed the results and noted they were normal for his right eye and his left eye showed "borderline normal with nonspecific changes." (Def. Mot., [85], Ex. C, Russ. Aff., para. 18). The test did not indicate Plaintiff currently had glaucoma. (Def. Mot., [85], Ex. E, Jay Aff., para. 7).

Defendant Dr. Russell examined Plaintiff a second time on September 1, 2016. (Def. Mot., [85], Ex. C, Russ. Aff., para. 19). The Defendant noted Plaintiff's visual acuity with his glasses was again 20/20 in his right eye and 20/50 in his left eye. (Def. Mot., [85], Ex. C, Russ. Aff., para. 20). Defendant Dr. Russell found Plaintiff's vision was stable and unchanged from the prior visit. (Def. Mot., [85], Ex. C, Russ. Aff., para. 21). Therefore, he again advised Plaintiff he did not meet the requirements for cataract surgery. (Def. Mot., [85], Ex. C, Russ. Aff., para. 22).

Defendant Dr. Russell says Plaintiff was scheduled for a return visit on November 2, 2016 "to determine the best spectacle correction," but the medical record indicates Plaintiff did not appear for this visit. (Def. Mot., [85], Ex. C, Russ. Aff., para. 23, 24). Plaintiff states there was a security issue in his cellhouse on this day and he was not allowed to leave his cell. (Plain. Resp., [93], p. 5).

Defendant Dr. Russell had no further contact with the Plaintiff and no longer worked at Pontiac after February of 2017. (Def. Mot., [85], Ex. C, Russ. Aff., para. 5).

Plaintiff's next eye examination was nearly two years later on August 30, 2018. (Def. Mot., [96], Bates #241). It is not clear why Plaintiff did not receive an eye examination during this time. Defendant Dr. Russell's final medical note indicates Plaintiff should continue to be monitored, but Defendants fail to explain why no follow up was scheduled. (Def. Mot., [85], IDOC #111).

Plaintiff claims he requested an eye appointment, but Plaintiff does not indicate when or how or what response, if any, he received. (Def. Mot., [98]. Ex. B, Plain. Depo., p. 73). Plaintiff also says he does not believe there was an optometrist at the facility during this time, but there is no clarification in the record. (Def. Mot., [98]. Ex. B, Plain. Depo., p. 73).

Plaintiff was examined by a non-party optometrist on August 30, 2018 who did not recommend surgery based on the evaluation. (Def. Mot., [96], Bates #241). Plaintiff says he did not meet the Wexford policy for cataract surgery.

Defendants do not clearly state Plaintiff's visual acuity with his glasses during this exam. Nonetheless, Optometrist Dr. Ludford's assessment clearly states Plaintiff

10

does not meet the criteria for surgery, but Plaintiff should continue with six-month follow-up appointments. (Def. Mot., [85], DOC #81).

Plaintiff filed his lawsuit on June 12, 2019. [1].

Plaintiff was examined by the same optometrist on October 22, 2019. On this occasion, the optometrist recommended Plaintiff for cataract surgery. (Def. Mot., [96], Bates #242, 336-37). Defendants do not provide an explanation of the medical record, but it appears there was a change in Plaintiff's left eye vision. (Def. Mot., [96], Bates #242)

Wexford approved the outside consultation on November 1, 2019, and and Plaintiff was referred to the University of Illinois Hospital in Chicago Ophthalmology Department for workup and surgery to remove the cataract in his left eye. (Def. Mot., [96], Bates #336-337).

While not clarified in the record, it appears Plaintiff was first approved for an unrelated surgery involving his mouth which took place in January of 2020. (Def. Mot., [96], Bates 338-344). Plaintiff's cataract surgery was not performed until February 21, 2021. (Def. Mot., [96], Bates #345).

Plaintiff does not believe the surgery was successful because his vision has only worsened since it occurred. (Def. Mot., [96], Plain. Dep. p. 44-45). Plaintiff says he now has pain in his left eye and it is sensitive to light and air. (Def. Mot., [96], Plain. Dep. p. 45).

In his deposition, Plaintiff says he was not diagnosed with a right eye cataract until about the time of his surgery in February of 2021. (Def. Mot., Plain. Depo., p. 46-

47). Plaintiff admits his right eye has never caused physical pain. (Def. Mot., Plain. Depo., p. 47).

Expert Witness Ophthalmologist Dr. Walter Jay maintains during the time Plaintiff met with Defendant Dr. Russell, his left eye was borderline for cataract surgery. (Def. Mot., [96], Jay Aff., para. 1). Dr. Jay says it is typical for optometrists and ophthalmologists to monitor mild, borderline cataracts to see if they progress over time. (Def. Mot., [85], Ex. E, para. 12). Expert Dr. Jay explains "[e]arly or borderline cataracts do not require surgery as the risks outweigh the benefits." (Def. Mot., [85], Ex. E, Jay. Aff., para. 11).

Expert Witness Dr. Jay states in his opinion, Plaintiff did not "require immediate medical attention including but not limited to cataract surgery of his left or right eye" during the time Dr. Russell was providing treatment. (Def. Mot., [85], Ex. E, Jay Aff., para. 9).

> In my opinion, and to a reasonable degree of medical certainty, the reason for Plaintiff's reduced vision in the left eye in 2019 and later was only partially due to his cataract. Plaintiff's prior 2005 left eye trauma caused not only a cataract but significant retinal damage which affected Plaintiff's vision. (Def. Mot., [85], Ex. E, Jay Aff., para. 8).

Expert Witness Dr. Jay also states it is his opinion that any delay in performing the left cataract surgery "did not cause the surgical complications that occurred during the procedure." (Def.Mot., [96], Ex. E, Jay Aff., para 6).

> The complications were related to the 2005 trauma to the left eye that caused structural damage to the eye (zonular instability). This structural damage … would have been present whenever surgery was performed. (Def.Mot., [96], Ex. E, Jay Aff., para 6).

B.  LEGAL STANDARD

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).  A movant may demonstrate the absence of a material dispute through specific cites to admissible evidence, or by showing that the nonmovant "cannot produce admissible evidence to support the [material] fact." Fed. R. Civ. P. 56(c)(B).  If the movant clears this hurdle, the nonmovant may not simply rest on his or her allegations in the complaint, but instead must point to admissible evidence in the record to show that a genuine dispute exists. *Id.; Harvey v. Town of Merrillville*, 649 F.3d 526, 529 (7th Cir. 2011).

At the summary judgment stage, evidence is viewed in the light most favorable to the nonmovant, with material factual disputes resolved in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A genuine dispute of material fact exists when a reasonable juror could find for the nonmovant.  *Id.*

C. ANAYLSIS

Defendants Dr. Russell and Wexford argue Plaintiff cannot demonstrate they violated his constitutional rights. To establish an Eighth Amendment violation, a plaintiff must show he suffered from a serious medical need and the Defendant was deliberately indifferent to that need. *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976); *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008).

A medical need is serious if it "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's care." *Gutierrez v. Peters,* 111 F.3d 1364, 1373 (7th Cir. 1997).

Defendant Dr. Russell argues Plaintiff did not suffer from a serious eye condition when he examined Plaintiff. Instead, Plaintiff had a mild, borderline cataract in his left eye which did not warrant surgery.

Court have previously recognized cataracts can be considered a serious medical condition. *See Burks v. Raemisch,* 555 F.3d 592, 594 (7th Cir.2009)(recognizing cataracts can be a serious medical condition); *Barrow v. Wexford Health Sources, Inc.*, 2014 WL 4267489, at *3 (S.D.Ill.Aug 28, 2014)( "vision loss associated with cataracts meets (serious medical condition) standard"); *Foster v. Ghosh*, 2013 WL 3790905, at *3 (N.D.Ill. July 19, 2013)("[c]ataracts can constitute serious medical condition.").

Perhaps Plaintiff's condition was at an early stage which was not yet "serious," but Defendant does not point to any caselaw clarifying where this line is drawn. In addition, Plaintiff also had a previous trauma to his left eye and other eye conditions which required monitoring. The Court cannot find there are no disputed issues of material fact as to whether Plaintiff suffered from a serious condition.

To determine whether the Defendant was deliberately indifferent to Plaintiff's medical need, "we look into his or her subjective state of mind." *Petties v. Carter*, 836 F3d 722, 728 (7th Cir. 2016), *citing Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996). In other words, "a plaintiff must provide evidence that an official *actually* knew of and

14

disregarded a substantial risk of harm." *Petties,* 836 F3d at 728 (emphasis in original), *citing Farmer v Brennan*, 511 U.S. 825, 844 (1994).

The Seventh Circuit has held "[a] medical professional is entitled to deference in treatment decisions 'unless no minimally competent professional would have so responded under those circumstances.'" *Sain v Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008), *quoting Collignon v Milwaukee County*, 163 F.3d 982, 988 (7th Cir. 1998). Therefore, for a medical professional to be liable for deliberate indifference to an inmate's medical needs, he must make a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Sain*, 512 F.3d at 895 (7th Cir.2008) (internal citations omitted).

Finally, the Eighth Amendment is not a vehicle for bringing claims of medical malpractice. *Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996). Inadequate medical treatment due to negligence or even gross negligence does not support an Eighth Amendment violation. *Shockley v. Jones*, 823 F.2d 1068, 1072 (7th Cir. 1987). Consequently, mere dissatisfaction or disagreement with a doctor's course of treatment is generally insufficient. *Snipes*, 95 F.3d at 591-92.

Defendant Dr. Russell says he only met with Plaintiff on two occasions in 2016. During both visits, the cataract in Plaintiff's left eye was mild and borderline for surgery, and there is no evidence Plaintiff had a cataract in his right eye. Additional testing demonstrated Plaintiff did not have glaucoma. The Defendant Doctor detected no change in Plaintiff's vision from one visit to the next.

The Plaintiff's eye condition did not meet Wexford's standard for surgery. However, Defendants have demonstrated the decision to monitor Plaintiff's mild, borderline cataract was the typical standard of care for optometrists and ophthalmologists, and the risks of surgery at this stage outweighed the benefits.

Defendant Dr. Russell left the facility a few months after his last examination of Plaintiff, and there is no evidence he had any involvement in scheduling or denying future eye exams, nor any further role in Plaintiff's eye care.

Plaintiff disagrees with Dr. Russell's assessment of his condition. Nonetheless, Plaintiff's has no medical training and no evidence to support his claim that cataract surgery was required in 2016. *See Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012) ("our favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture.")(internal citation omitted); *Hall-Bey v Hanks*, 93 Fed.Appx 977, 980 (7th Cir. 2004)("conclusory statements cannot sustain a non-movant's burden on summary judgment."); *Stagman v Ryan*, 176 F.3d 986, 995(7th Cir. 1999)("statements that are the result of speculation or conjecture or merely conclusory" do not meet requirements of Rule 56).

In short, Plaintiff's "mere disagreement with a medical professional's chosen course of treatment cannot establish a constitutional violation." *Moffett v. Garland*, 2021 WL 3362255, at *2 (7th Cir. 2021), *citing Cesal v. Moats*, 851 F.3d 714, 722 (7th Cir. 2017); *see also Maddox v. Wexford Health Sources, Inc.*, 2015 WL 12766485, at *5 (C.D.Ill. Sept.11, 2015) (plaintiff's disagreement with doctors' decision not to refer him for cataract surgery does not mean defendants were deliberately indifferent). "Nor does the Eighth

16

Amendment give prisoners the right to demand specific medical treatment." *Moffett*, 2021 WL 3362255, at *2 (citation omitted).

The Court is concerned about the gap in providing eye care to the Plaintiff after Defendant Dr. Russell left the facility. Based on the record, it is unclear why this occurred. However, there is no evidence the delay had any impact on Plaintiff's eye condition. The optometrist who met with Plaintiff on August 30, 2018 did not find cataract surgery was appropriate. When the optometrist did recommend surgery, it was approved. More important, Defendant Dr. Russell was not involved in Plaintiff's eye care at this point, since he was no longer employed at Pontiac. Defendant Dr. Russell's Motion for Summary Judgment is granted.

Defendant Wexford also argues it is entitled to summary judgment. Wexford can only be held liable under 42 U.S.C. §1983 if it had an unconstitutional policy or practice which caused the alleged deprivation. *See Woodward v Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004); *Monell v. N.Y. City Dep't of Soc. Svcs.*, 436 U.S. 658, 694 (1978).

Plaintiff must show his alleged constitutional violation was caused by: (1) an express policy that caused a constitutional deprivation when enforced; (2) a widespread practice that was so permanent and well-settled that it constituted a custom or practice; or (3) a person with final policymaking authority." *Ridgeway v. Wexford Health Sources, Inc.*, 2022 WL 124447, at *5 (S.D.Ill. Jan 13, 2022); *citing Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021).

In this case, Plaintiff claims Defendant Wexford had an express policy which prevented him from receiving a needed cataract surgery. Plaintiff must demonstrate this policy "was the moving force behind his constitutional injury." *Estate of Perry v. Wenzel*, 872 F.3d 439, 461 (7th Cir. 2017).

The evidence before the Court demonstrates Wexford's Cataract Management Policy provided guidelines for cataract surgery, not requirements. The policy explicitly states it is not meant to replace an individual provider's clinical judgment. *See Maddox,* 2015 WL 12766485, at *7 (policy of not providing cataract surgery for inmates with binocular vision of 20/60 or better is not constitutionally deficient as it is not a hard and fast rule, and intended only as a guide, not a replacement for clinical judgment). Three separate optometrists evaluated Plaintiff's eyes, and none believed he was an appropriate candidate for surgery until October of 2019.

Defendants have further demonstrated Wexford's policy is within the standard of care expected for optometrists and ophthalmologists. Ophthalmologist Dr. Jay states it is typical to monitor mild, borderline cataracts rather than recommend surgery due to the associated risks with surgery.

In addition, Expert Witness Ophthalmologist Dr. Jay notes there were additional risks associated with Plaintiff's condition due to his previous left eye trauma which caused some damage to the structure of his eye.

Finally, when an optometrist did recommend cataract surgery for Plaintiff's left eye on October 22, 2019, Wexford immediately approved the outside referral. There is

also no evidence any provider diagnosed Plaintiff with a right eye cataract prior to the filing of his complaint, nor has any provider ever recommended surgery.

Plaintiff cannot demonstrate Wexford's policy led to a violation of his constitutional rights. Wexford's Motion for Summary Judgment is granted.

**IT IS THEREFORE ORDERED:**

1) Defendant Russell's Motion to Strike and Motion for Sanctions are DENIED [98], [99].

2) Defendant Dr. Michael Russell's Motion for Summary Judgment, [85], and Defendant Wexford's Motion for Summary Judgment, [96]; are both GRANTED pursuant to Federal Rule of Civil Procedure 56. The Clerk of the Court is directed to enter judgment in favor of Defendants and against Plaintiff. This case is terminated, with the parties to bear their own costs.

3) If Plaintiff wishes to appeal this judgment, he must file a notice of appeal with this Court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal in forma pauperis MUST identify the issues the Plaintiff will present on appeal to assist the court in determining whether the appeal is taken in good faith. *See* Fed. R. App. P. 24(a)(1)(c); *See also Celske v Edwards*, 164 F.3d 396, 398 (7th Cir. 1999)(an appellant should be given an opportunity to submit a statement of his grounds for appealing so that the district judge "can make a reasonable assessment of the issue of good faith."); *Walker v O'Brien*, 216 F.3d 626, 632 (7th Cir. 2000)(providing that a good faith appeal is an appeal that "a reasonable person could suppose…has some merit" from a legal

perspective). If Plaintiff does choose to appeal, he will be liable for the $505.00 appellate filing fee regardless of the outcome of the appeal.

Entered this 7th day of February, 2023.

                              s/James E. Shadid

                              _____
                              JAMES E. SHADID
                             UNITED STATES DISTRICT JUDGE